UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

LISA K.,                                )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No. 2:20-cv-00253-DLP-JRS
                                        )
KILOLO KIJAJAZI,                        )
                                        )
                    Defendant.          )

<u>**ORDER**</u>

Plaintiff Lisa K. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g); 1383(c). For the reasons set forth below, the Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration.

## I.  PROCEDURAL HISTORY

On August 8, 2016, Lisa protectively filed her application for Title XVI SSI. (Dkt. 13-2 at 17; 170, R. 17; 170). Lisa alleged disability resulting from a degenerative/herniated disc, obstructed nerve, posttraumatic stress disorder ("PTSD"), and alcoholism. (Id. at 194, R. 194). The Social Security Administration ("SSA") denied Lisa's claim initially on October 19, 2016, (Id. at 86, R. 86), and on reconsideration on March 6, 2017. (Id. at 98, R. 98). On March 21, 2017, Lisa filed a request for a hearing, which was granted. (Id. at 106, R. 106).

1

On January 9, 2019, Administrative Law Judge ("ALJ") Victoria A. Ferrer conducted a video hearing from Orland Park, Illinois, with Lisa and her counsel appearing in Indianapolis, Indiana, and vocational expert Aimee Mowery participating by phone. (Dkt. 15-2 at 4, R. 696). The day of the hearing, Lisa amended her alleged onset date from October 26, 2007 to August 8, 2016. (Dkt. 13-2 at 192, R. 192). On April 1, 2019, ALJ Ferrer issued an unfavorable decision finding that Lisa was not disabled. (Id. at 14-30, R. 14-30). On May 16, 2019, the SSA received Lisa's appeal of the ALJ's decision. (Id. at 170, R. 170). On March 13, 2019, the Appeals Council denied Lisa's request for review, making the ALJ's decision final. (Id. at 1, R. 1). Lisa now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g); 1383(c).

## II.   STANDARD OF REVIEW

To qualify for disability, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has

2

implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 416.920. (A negative answer at any point, other than step three and five, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01

(7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of her age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is

not whether Lisa is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), *as amended* (Dec. 13, 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [her] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace

the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.   BACKGROUND

### A.  Lisa's Relevant Medical History

On January 19, 2015, Lisa treated with her primary care provider, Tom S. Kirkwood, M.D., for chronic lower back pain and radicular pain in her lower extremities. (Dkt. 13-4 at 185-86, R. 524-25). Her active problems were noted to be back pain, depression, chronic reflux, essential hypertension, fibromyalgia, insomnia, neck pain, and tobacco use. (Id. at 186, R. 525). Dr. Kirkwood assessed hypertension and chronic lumbago[1], and continued prescriptions for both, including Norco and Ultram for pain. (Id. at 185, R. 524). On February 19, 2015, Lisa returned to Dr. Kirkwood reporting increased anxiety because her grandchild was in the hospital. (Id. at 189, R. 528). Dr. Kirkwood diagnosed anxiety disorder and continued an Ativan prescription. (Id.). On March 19, 2015, Lisa complained of left shoulder pain and right hip pain and stiffness. (Dkt. 13-4 at 193, R. 532). On April 14, 2015, Lisa returned to Dr. Kirkwood with complains of worsening chronic low back pain, for which her Norco prescription was continued. (Dkt. 13-4 at 197, R. 536). On May 14, 2015, June 15, 2015, and July 14, 2015, Lisa reported continued anxiety and lower back pain, for which her prescriptions of Norco and Ativan were continued. (Dkt. 13-4 at 205, 209, 213, R. 544, 548, 552). On August 11, 2015, Lisa

---

[1] Lumbago is another term for acute mechanical back pain. Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/4879-acute-mechanical-back-pain (last visited June 16, 2021).

reported chronic low back with radicular pain into both legs; hip joint pain, stiffness, and instability; limping, numbness and tingling in both legs; numbness in the buttocks. (Dkt. 13-4 at 180, R. 519). On September 11, 2015, Lisa reported feeling tired and fatigued, as well as symptoms of anxiety, depression, and sleep disturbances, to Dr. Kirkwood. (Dkt. 13-3 at 6-7, R. 287-88). He noted that blood work was pending for her hypertension and complaints of fatigue. (Id.) Lisa also reported increased back pain from being on her feet more after starting a job working in a pub. (Id. at 7, R. 288). Her Ativan prescription was renewed. (Id.).

On October 12, 2015, Lisa returned to Dr. Kirkwood and complained of continued low back pain and anxiety, for which her prescriptions of Ativan and Norco were renewed. (Dkt. 13-3 at 10-11, R. 291-92). On November 13, 2015, Lisa informed Dr. Kirkwood that she had been very fatigued and anxious, and that her back pain had not improved any. (Dkt. 13-3 at 16, R. 297). Her medications were renewed. (Id.). On December 18, 2015, Lisa returned to Dr. Kirkwood and noted that she had been working more hours at work and that her back pain had not improved and was stable with taking her pain medications. (Id. at 21, R. 302).

On January 19, 2016, Lisa saw Dr. Kirkwood in follow-up for her continued back pain and anxiety, and her medications were continued. (Dkt. 13-3 at 25, R. 306). Lisa returned to Dr. Kirkwood on February 2, 2016 for her low back pain, and she received a diagnosis of chronic lumbago. (Id. at 29, R. 310). On February 19, 2016, Lisa reported to Dr. Kirkwood continued low back pain that radiated into her legs, along with numbness and tingling in her butt and legs. (Id. at 34, R. 315). On

April 12, 2016, Lisa returned to Dr. Kirkwood with complaints of chronic low back pain, anxiety, and ear issues, where she presented as anxious during the exam. (Dkt. 13-3 at 1-4, R. 282-285). Her Ativan prescription was renewed. (Id.).

On April 26, 2016, Lisa voluntarily admitted herself to Brentwood Meadows for detoxification from alcohol. (Dkt. 13-4 at 118, R. 457). She reported coming home in November 2015 and witnessing the sexual assault of her 11-year old granddaughter by her son-in-law's 14-year old cousin. (Id.). She reported drinking one-fifth of whiskey per day for the past five months and up to one gallon per day for the last one or two months. (Id.). She also reported being unemployed for the past two to three months because of her alcohol use. (Id.). She explained that her alcohol use had been chronic and longstanding in nature, although she became much more interested in discontinuing her alcohol use after the maltreatment within the home. (Id.). She was discharged on May 5, 2016, with her diagnoses including severe alcohol use disorder and major depressive disorder, recurrent, severe, with a Global Assessment of Functioning ("GAF") of 50, and chronic back pain. (Id. at 116-17, R. 455-56).

On May 6, 2016, Lisa attended an initial assessment at the Hamilton Center where she reported a history of being sexually assaulted at age 12 by her brother, being physically abused by her mother, a suicide attempt by overdosing on Xanax in 2013, and subsequent treatment with a psychiatrist. (Id. at 50-52, R. 389-91.) Her examination was within normal limits including her adequate focused attention, logical and coherent thought processes, speech, cooperation and rapport with the

therapist, alertness, orientation, and affect, except she was very anxious and shaking in her hands. (Id. at 52, R. 391). She was diagnosed with severe alcohol use disorder and PTSD. (Id.).

On May 10, 2016, Lisa returned to Dr. Kirkwood with complains of continued anxiety and withdrawal symptoms. (Dkt. 13-4 at 166, R. 505). On June 10, 2016, Lisa reported to Dr. Kirkwood that she had been sober for one month but had continued low back pain that radiated into both legs, as well as anxiety and sleep disturbances. (Id. at 169, R. 508).

On August 5, 2016, Lisa was admitted to IU Health Bloomington Behavioral Care after her daughter reported to an emergency response service that Lisa had expressed "marked suicidal ideations while acutely intoxicated with alcohol." (Dkt. 13-3 at 43, R. 324). Lisa had a blood alcohol level of 254 mg/dl and she reported relapsing twice since going through rehab. (Id.). She was admitted for chronic depression, chronic alcoholism, and acute suicidal ideation. (Id. at 41, R. 322). She reported trying various antidepressants in the past. (Id. at 43, R. 324). She described having suicidal thoughts, sleep problems, low energy, low interest, low motivation, and marked anxiety. (Id.). On August 7, her GAF was noted to be 35. (Id. at 45, R. 326). Her discharge diagnoses on August 12, 2016, by psychiatrist Steven Michael Goad, M.D., were chronic PTSD, adjustment disorder with mixed disturbance of emotions and conduct, alcohol dependence, alcohol induced mood disorder, and borderline personality disorder, with a GAF of 49, for which she was to continue taking trazodone, Risperdal, and Lexapro. (Id. at 56, R. 337). Dr. Goad

noted that Lisa appeared to have Borderline Intellectual Functioning. (Id. at 48, R. R. 329). explained that "[i]t gradually became clear that this patient had a primary anxiety issue that seemed ultimately to be rooted in the history of trauma, [PTSD], and her alcohol use seemed to be largely self-medication for intense anxiety." (Id. at 56-57, R. 337-38).

On August 19, 2016, Lisa was again referred to the Hamilton Center for complaints of racings thoughts and inability to focus. (Dkt. 13-4 at 54, R. 393). Lisa noted that she would wake from sleeping approximately every hour and get only four hours of total sleep, and that she would be woken up with an anxiety attack and gasping for air. (Id.). Her affect was anxious and blunted, she had fair insight, judgment, and impulse control, with organized thought processes, but auditory hallucinations were indicated. (Id. at 57, R. 396).

On October 11, 2016, at the request of the SSA, Lisa attended a consultative examination with licensed clinical psychologist Gary Maryman, Psy.D. (Id. at 217, R. 556). Lisa reported that she is unable to work because it is hard to be around other people. (Id.). Lisa lives in a house owned by a friend, and chose to wash her clothes in the sink instead of go to a laundromat because she did not want to be around so many other people. (Id.). Dr. Maryman noted the inconsistency between Lisa indicating that she has no friends and her stating that she lived in a house owned by a friend. (Id. at 217-18, R. 556-57). Dr. Maryman described her as reasonably reliable in areas of her activities of daily living and difficulty being around people. (Id.). Dr. Maryman expressed his opinion that Lisa's alcohol abuse

10

was the primary factor. (Id.). Dr. Maryman diagnosed Lisa with a history of alcohol

abuse, being a victim of physical abuse, and a dysthymic disorder. (Id. at 219, R.

558). He gave the following medical source statement:

> [Lisa] was believed to be a lady who seems likely to have the
> intellectual ability for her to understand, retain, and to carry[ ]out . . .
> simple to somewhat more complicated instruction[s] and task[s]. It was
> also believed that she would seem to have the ability to carry out a
> work assignment sufficiently well across a routine work schedule. This
> lady should be able to interact reasonably well with fellow workers and
> supervisors and she does not appear necessarily unable to interact and
> deal with the general public as well. It is also believed that she should
> be able to adjust and adapt to stressors and pressures of at least a
> medium to lower stress work environment.

(Id.). Dr. Maryman also stated that Lisa "would not be capable of managing funds."

(Id.).

On November 18, 2016, Lisa reported to Dr. Kirkwood that she had recently

completed 30 days of alcohol abuse treatment, was seeing a nurse practitioner and

therapist, and needed a refill of Lexapro and Risperdal. (Id. at 241, R. 580). She was

diagnosed with essential hypertension and chronic lumbago. (Id. at 243, R. 582).

On February 8, 2017, Lisa was reassessed at the Hamilton Center; she

reported a history of visual and auditory hallucinations when she drank, and her

stated treatment goal was to maintain sobriety. (Id. at 271-78, R. 610-17). On

March 1, 2017, she was a "no show." (Id. at 279, R. 618). Lisa was discharged from

Hamilton Center on June 20, 2017—with a diagnosis of severe alcohol use

disorder—for dropping out of treatment. (Id. at 280, R. 619).

On March 17, 2017, Lisa reported to Dr. Kirkwood that she had severe left

hip pain, the joint felt unstable, and she had difficulty climbing stairs because of leg

weakness. (Id. at 282-84, R. 621-23). Her examination revealed tenderness in the left hip joint and she was prescribed Medrol. (Id.). On April 20, 2017, Lisa reported to Dr. Kirkwood that she had an incident on March 24, when her daughter's father-in-law knocked her down and stomped on her leg and foot. (Id. at 286, R. 625). She reported stress and difficulty sleeping in anticipation of further conflict with the man involved. (Id.). Dr. Kirkwood prescribed Celexa for anxiety. (Id.). On examination, Lisa had decreased range of motion in the left knee and discoloration of her skin consistent with a healing bruise, and pain and stiffness in her hip joint. (Id. at 288, R. 627).

On May 26, 2017, Lisa reported to Dr. Kirkwood that she had treated with another physician, Dr. Fenwick, who ran an MRI of her left that showed a fracture of her tibia and a torn ACL, for which she was currently doing physical therapy."[2] (Id. at 290, R. 629). On examination, she had increased swelling of her left knee. (Id. at 292, R. 631). She also reported that she had not been sleeping and had been very anxious and stressed. (Id. at 290, R. 629). Dr. Kirkwood continued her medications and indicated that Lisa's knee injury would be followed by Dr. Fenwick. (Id.).

On July 13, 2017, Lisa returned to Dr. Kirkwood for treatment of anxiety, reporting that she continued to have episodes, but she had stopped taking Celexa after 15 days because she didn't notice any difference. (Id. at 294, R. 633). She also reported feeling tired and having episodes of anxiety. (Id.). Dr. Kirkwood noted that blood work was pending for her complaints of fatigue and "fluctuating blood

---

[2] Only Dr. Kirkwood's treatment records related to Lisa's 2017 leg injury appear in the record.

pressure," possibly related to hypertension and/or hyperlipidemia. (Id.). Dr. Kirkwood stated that new medication for Lisa's anxiety would not be given at that time. (Id.). On August 18, 2017, Lisa reported new symptoms related to a urinary tract infection. (Id. at 298, R. 637). She also reported continued anxiety, as well as pain and stiffness in one or more joints. (Id. at 301, R. 640).

On October 12, 2017, Dr. Kirkwood noted that Lisa had "high cholesterol readings" in blood work taken the previous visit. (Id. at 302, R. 641). She reported left knee joint pain and stiffness. (Id. at 303, R. 642). On October 24, 2017, she reported increased fatigue, not feeling well, and easy bruising, and Dr. Kirkwood noted that she had elevated liver enzymes. (Id. at 306, R. 645). She also had abdominal tenderness in her right upper quadrant on examination. (Id. at 308, R. 647). However, an ultrasound was normal. (Id. at 310, R. 649). She was diagnosed with viral hepatitis. (Id. at 311, R. 650).

On January 11, 2018, Lisa reported to Dr. Kirkwood that she had continued fatigue, abdominal pain, chills, diarrhea, and headaches. (Id. at 314, R. 653). On March 8, 2018, Lisa reported weight gain, swelling in her abdomen, tingling/burning in her legs from the thigh down, and right flank pain. (Id. at 317, R. 656). For the latter, she reported going to the emergency room and being diagnosed with a urinary tract infection. (Id.). On May 10, 2018, Lisa reported "feeling tired," but she was "dieting and exercising" and had "quit smoking and drinking." (Id. at 321, R. 660).

On June 29, 2018, Lisa reported to Dr. Kirkwood that she had been having episodes of dizziness, lightheadedness, headaches, confusion, and memory loss for over a month, and that the episodes were worsening. (Id. at 325, R. 664). During the episodes, she would go into a daze and forget what she was doing or saying. (Id.). Lisa was referred to the ER for further evaluation. (Id). On July 5, 2018, she reported to Dr. Kirkwood that she had experienced worsening headaches, dizziness, fatigue, confusion, blurred vision, and memory loss. (Id. at 329-32, R. 668-71). The ER doctor had told her to keep a diary of these episodes, but this frustrated her because she could not remember the details. (Id.). On August 23, 2018, Lisa reported increased anxiety, difficulty sleeping, panic episodes with a racing heart and labored breathing, fatigue, and a lack of energy. (Dkt. 13-5 at 1, R. 676). Dr. Kirkwood wanted to evaluate Lisa's thyroid function. (Id.).

## B.  Factual Background

Lisa was 47 years old when she filed the application under review. (*See* Dkt. 13-2 at 170, R. 170). She has earned a GED. (Id. at 195, R. 195). She has worked in assisted living and as a bartender. (Id.).

## C.  ALJ Decision

In determining whether Lisa qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a) and concluded that Lisa was not disabled. (Id. at 14-30, R. 14-30). At

Step One, the ALJ found that Lisa had not engaged in substantial gainful activity

since the application date[3] of August 8, 2016. (Id. at 19, R. 19).

At Step Two, the ALJ found that Lisa suffered from "the following severe

impairments: history of left torn anterior cruciate ligament (ACL), history of left

tibia fracture, posttraumatic stress disorder (PTSD), depression, anxiety and

alcohol abuse disorder." (Id. at 19, R. 19 (citation omitted)). The ALJ also found that

hypertension was a non-severe impairment. (Id.). The ALJ explained that Lisa had

chronic lower back pain since 2006, but there were "no clinical signs or laboratory

findings to support [a] diagnosis during the relevant period." (Id. at 20, R. 20

(citations omitted). The ALJ explained further:

> Even if there were sufficient clinical signs and findings to support the
> existence of a medically determinable impairment, this impairment
> would be non-severe as there is no evidence of any continuous
> functional limitation lasting at least 12 consecutive months. As such,
> there is no severe medically determinable impairment related to the
> claimant's back.

(Id.). The ALJ also found that fibromyalgia was not a medically determinable

impairment. (Id.). As to the "paragraph B" criteria for her mental impairments, the

ALJ concluded that Lisa had moderate limitations in understanding, remembering,

or applying information and interacting with others and mild limitations in

concentrating, persisting, or maintaining pace and adapting or managing herself.

(Dkt. 13-2 at 20-21, R. 20-21).

---

[3] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

At Step Three, the ALJ found that Lisa's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. (Id. (citing 20 C.F.R. §§ 416.920(d); 416.925; 416.926)).

After Step Three but before Step Four, the ALJ found that Lisa had the RFC "to perform light work as defined in 20 CFR 416.967(b)," with the following additional limitations:

- only occasionally operate foot controls;
- cannot climb ladders or scaffolds or work in high exposed places;
- occasionally kneel, crawl, or climb ramps or stairs;
- frequently stoop or crouch;
- can perform simple, routine, and repetitive tasks;
- able to understand, remember, and carry out simple instructions;
- can make decisions on simple matters;
- no public interaction; and
- occasional interaction with coworkers and supervisors.

(Dkt. 13-2 at 19, R. 19).

At Step Four, the ALJ determined that—including consideration of Lisa's earnings as a bartender—there was insufficient evidence to find that she had any past relevant work. (Id. at 29, R. 29).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Lisa's age, education, work experience, and RFC, she was capable of adjusting to other work with jobs existing in significant numbers in the national economy in representative occupations such as an inspector, marker, and sorter/counter. (Id. at 29-30, R. 29-30). The ALJ concluded that Lisa was not disabled. (Id. at 30, R. 30).

**IV.   ANALYSIS**

Lisa argues that this matter should be remanded because (1) the ALJ's decision is based on cherry-picked evidence that overlooks her difficulties in functioning and (2) the ALJ failed to build a logical bridge from the evidence to her conclusions. (Dkt. 19 at 11). Specifically, Lisa presents arguments related to the ALJ's Step Two and Step Three findings, both the mental and physical RFC, the ALJ's evaluation of Lisa's subjective symptoms, and the ALJ's treatment of a third-party statement. The Court will address the arguments in turn.

As an initial matter, the Court finds it important to note that while each of Lisa's arguments touches on her alleged back pain and fibromyalgia, the ALJ did not find Lisa's lumbago or fibromyalgia to be medically determinable impairments. (Dkt. 13-2 at 20, R. 20). Lisa does not challenge the ALJ's conclusion that neither condition constituted a medically determinable impairment. To the extent that Lisa relies on her lumbago or fibromyalgia diagnoses and lower back pain to support greater limitations or her contention that the ALJ's decision was in error or incomplete, (*see, e.g.*, Dkt. 19 at 18-19), the Court cannot accept those statements and will not address those conditions in this opinion.

**A. Steps Two and Three**

First, Lisa argues that the ALJ erred during the Step Two and Step Three analyses by failing to consider critical evidence when assessing the "paragraph B" criteria. (Dkt. 19 at 11). Lisa maintains that the ALJ did not adequately consider the recent sexual assault of Lisa's granddaughter and her own history of trauma,

her low GAF scores, and her history of taking sedative medications. (Id. at 11-12). Additionally, Lisa contends that the ALJ cherry-picked evidence to conclude that Lisa had a mild limitation with respect to her ability to maintain concentration, persistence, and pace. (Id. at 13-15). Overall, Lisa argues that the ALJ failed to present a complete picture of how her chronic pain, anxiety, depression, and PTSD affect her functional capabilities. (Id.).

When evaluating a claimant's mental impairments, ALJs must use a special technique that analyzes pertinent symptoms, signs, and laboratory findings to determine whether a medically determinable impairment exists. 20 C.F.R. § 404.1520a(b)(1). If a medically determinable impairment exists, the ALJ must then assess a claimant's functional limitations by utilizing a complex and highly individualized process that considers all relevant and available clinical signs and laboratory findings, the effects of symptoms, and how functioning may be affected by other factors such as chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(c)(1). ALJs shall analyze functional limitations by looking to four broad categories: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(3). To evaluate these four areas, ALJs will investigate how an impairment interferes with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis, as well as the quality and level of overall functional performance, any episodic limitations, the amount of supervision or assistance

18

required, and the settings in which a claimant is able to function. 20 C.F.R. § 404. 1520a(c)(2). These four areas will be rated on a five point scale: none, mild, moderate, extreme, marked. 20 C.F.R. § 404.1520a(c)(4).

The ALJ's decision must be read as a whole. See, *Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir.2004) (states that "it is proper to read the ALJ's decision as a whole, and ... would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five")). The Seventh Circuit has explained that "an ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citing *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) (collecting cases)).

In this opinion, the ALJ built an accurate and logical bridge from the evidence to her conclusions at Step Two and Three regarding Lisa's impairments. (*See* Dkt. 13-2 at 26, R. 26). The ALJ specifically discussed the underlying traumas in the record, including Lisa's history of being sexually assaulted and the more recent violent conflict with her extended family. (Id.). The ALJ also discussed Lisa's need for an inpatient psychiatric stay followed by "medication management consisting of antidepressants, antianxiety medication and mood stabilizers." (Id. (citation omitted)).

The ALJ also confronted GAF scores assigned by Lisa's providers that indicated "major" or "serious" impairment. (Id. at 28, R. 28). As the Seventh Circuit has noted, GAF scores tend to bounce around a great deal because they depend on

how the claimant happens to feel the day she is examined. *Bertha M. v. Saul*, 395 F.

Supp. 3d 963, 968 (N.D. Ill. 2019) (citing *Voigt v. Colvin*, 781 F.3d 871, 875 (7th Cir.

2015)). Similarly, the ALJ explained her decision to give little weight to the GAF

scores, she noted:

> GAF scores in general are of limited evidentiary value. These
> subjectively assessed scores reveal only snapshots of impaired and
> improved behavior. The undersigned gives more weight to the objective
> details and chronology of the record, which more accurately describe the
> claimant's impairments and limitations.

(Id.). This discussion is sufficient.

The ALJ contrasted the evidence that Lisa had acute symptoms—suicidal

ideation, racing thoughts, and hallucinations—during periods of intensive mental

health treatment with Lisa's limited engagement with treatment thereafter. (Id. at

26, R. 26). The ALJ explained that Lisa dropped out of specialized treatment with

the Hamilton Center after a couple visits and was then managed exclusively by her

primary care doctor, Dr. Kirkwood. (Id.). The ALJ also highlighted that Lisa elected

to discontinue taking the antidepressant, Celexa, that Dr. Kirkwood prescribed for

anxiety, after only 15 days, because she said it was not helpful. (Id.) (citing Dkt. 13-

4 at 294, R. 633)). The ALJ noted that Lisa "continued to report intermittent

episodes of anxiety and sleep disturbance, but no new medications were prescribed."

(Dkt. 13-2 at 26, R. 26). The ALJ also stated that Lisa's mental status examination

findings were predominantly normal amongst Lisa's various treatment providers.

(Id.).

While Lisa relies on "new episodes of dizziness," (Dkt. 19 at 19), and "diagnosed fatigue" (Dkt. 19 at 22), to support limitations in the RFC, she has failed to identify a medically determinable impairment that would cause those symptoms. The ALJ noted that though Lisa complained of dizziness in June 2018, there was no evidence that the symptoms persisted for 12 months. (Dkt. 13-2 at 19, R. 19). Consistent with the statutory definition of disability, "[u]nless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months," 20 C.F.R. § 416.909, an impairment must meet the durational requirement for its functional effects to be considered. *See* 42 U.S.C. § 423(d)(1)(A) (statutory definition of disability).

Lisa also asserts that the ALJ's finding of a mild limitation with concentration, persistence, or maintaining pace ignored Lisa's more acute symptoms, the effects of her physical impairments including pain and fatigue, and the fact that her mental symptoms wax and wane. (Dkt. 19 at 13-15). The ALJ justified her decision that Lisa was mildly limited in her ability to concentrate, persist, and maintain pace by (1) pointing to Plaintiff's Field Office interview where she had no difficulty concentrating, (2) reviewing Lisa's consultative exam which show good concentration, and (3) highlighting select treatment notes that showed normal thought process, orientation, and energy levels for Lisa. (Dkt. 13-2 at 21, R. 21). The ALJ did not, however, acknowledge the various treatment records that showed over a year's worth of fatigue and tiredness complaints, Lisa's medication

changes, hospitalization, and continuous anxious and racing thoughts that affected her ability to concentrate.

Nevertheless, reviewing courts are not permitted to reweigh the evidence, and the Court is satisfied that the ALJ has presented sufficient evidence to support her determination as to Lisa's ability to concentrate, persist, or maintain pace. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014) ("To determine whether substantial evidence exists, the court reviews the record as a whole….[and] [w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict."). As such, the Court finds no basis to disturb the ALJ's analysis at Steps Two or Three.

### B. Subjective Symptoms

Lisa next argues that the ALJ erred when evaluating her subjective symptom statements by failing to acknowledge that Lisa was twice hospitalized for mental issues and sought treatment at an in-patient facility; failing to recognize that Lisa's medications for anxiety and depression were frequently adjusted and discontinued due to side effects; and not identifying any activity of daily living that would suggest Lisa was capable of meeting the assigned RFC. (Dkt. 19 at 28-30).

When evaluating a claimant's subjective statements about the intensity and persistence of her symptoms, the ALJ must often, as here, make a credibility determination concerning the limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). "RFC determinations are inherently intertwined with

22

matters of credibility, and we generally defer to an ALJ's credibility finding unless it is 'patently wrong.'" *Outlaw v. Astrue*, 412 F. App'x 894, 897 (7th Cir. 2011) (quoting *Jones*, 623 F.3d at 1160). The ALJ may consider inconsistencies between the severity of symptoms that the claimant described to the SSA compared with when she was seeking treatment, the failure to regularly seek treatment for those symptoms, the level of treatment, and the effectiveness of treatment. *See, e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence).

The Seventh Circuit has explained that "[i]t is true that 'infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.'" *Beardsley*, 758 F.3d at 840 (quoting *Craft,* 539 F.3d at 679). "But the ALJ may not draw any inferences 'about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" *Id.* (quoting *Craft*, 539 F. 3d at 679). The Court notes that *Craft* was applying the since rescinded Social Security Ruling ("SSR") 96-7p. 539 F. 3d at 679. However, the ruling that replaced it, SSR 16-3p, includes the same relevant guidance:

> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged

23

intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *9.

Lisa testified that she did not stay on psychiatric medications because she had adverse reactions to them, such as suicidal tendencies. (Dkt. 15-2 at 21, R. 713). The ALJ's decision explained that not taking psychiatric medication "indicates that her mental impairments are not as severe or as limiting as alleged. While the claimant testified that she does not take medication because of side effects, there are no such complaints in any treatment record." (Dkt. 13-2 at 27, R. 27). As noted previously, Lisa stated to her doctor that she stopped taking the most recently prescribed antidepressant after only 15 days because she did not think it made a difference. (Dkt. 13-4 at 294, R. 633). Thereafter, Dr. Kirkwood did not prescribe any psychiatric medications and Lisa was not compelled to seek any further specialized treatment, which does tend to support the ALJ's assessment of the severity of her mental impairments.

Lisa also testified that she went to mental health counseling every two weeks beginning in April 2018. (Dkt. 15-2 at 21-22, R. 713-14). However, the ALJ explained that the record indicated that Lisa dropped out of therapy in June 2017, after just one session, and there was no evidence submitted that she went to another provider. (Dkt. 13-2 at 27, R. 27). The Seventh Circuit has held that when an applicant for social security benefits is represented by counsel, the

administrative law judge is entitled to assume that the applicant is making her strongest case for benefits. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). During the hearing, Lisa's representative stated that the record was complete. (Dkt. 15-2 at 5, R. 697), and has failed to direct the Court to any evidence supporting this testimony.

The ALJ was entitled to rely on the record as developed, she confronted the significant evidence of Lisa's mental health functioning, and the ALJ gave valid reasons to discredit the severity of Lisa's allegations that were supported by substantial evidence. Accordingly, the ALJ's credibility determination concerning Lisa's mental impairments was not patently wrong.

### C. Third Party Statement

Lisa also argues that the ALJ's reasons for rejecting the third-party function report filled out by Lisa's daughter are either invalid or unsupported. (Dkt. 19 at 31-32). The ALJ explained that Lisa's daughter was not "unbiased" and there was no evidence she was "a medical professional or otherwise familiar with Agency criteria for disability determinations." (Dkt. 13-2 at 28). The Court agrees that neither reason is particularly compelling to give little weight to a lay witness's account that is based on personal familiarity with the claimant's functioning. In fact, courts have concluded that neither reason is enough to discount a third party's statement. *Austin M. v. Saul*, No. 3:20 CV 457, 2021 WL 777855, at *12 (N.D. Ind. Mar. 1, 2021) (collecting cases). If the ALJ had stopped after citing these two reasons for discounting Lisa's daughter's statement, this would have been error.

However, the ALJ went on to explain that she nevertheless considered Lisa's daughter's "observations, including those regarding claimant's anxiety around others, occasional forgetfulness, difficulty following directions, back pain and alcohol use, in formulating the extensive limitations in the above residual functional capacity." (Id.).

The ALJ did not credit all the functional limitations described by Lisa's daughter. (*See* Dkt. 13-2 at 230-37, R. 230-37). Her descriptions, though, are not materially different from Lisa's own subjective statements about her limitations. The Seventh Circuit has held that when a familial witness "corroborates" the claimant's testimony with "essentially redundant" testimony, the ALJ need not address it so long as the decision confronted all the important lines of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Here, as explained above, the ALJ addressed the necessary lines of evidence and her credibility determination concerning Lisa's subjective statements was not patently wrong. Accordingly, the ALJ did not err based on her treatment of Lisa's daughter's statement.

### D. Residual Functional Capacity

#### i.   Physical Limitations

Next, Lisa asserts that the ALJ failed to complete a proper function-by-function analysis of her work capabilities. (Dkt. 19 at 18-21). Lisa argues that the ALJ failed to adequately consider her back, leg, foot, knee, and hip pain diagnoses in addition to her subjective allegations, which led to the ALJ's insufficient RFC analysis. (Id.). Lisa contends that the ALJ should have included appropriate

postural limitations for sitting, standing, and walking and case usage, and more restrictive limitations for climbing ramps and stairs and kneeling, crawling, stooping, or crouching. (Id.). Finally, Lisa maintains that all of these proposed functional limitations should have resulted in a conclusion that she was limited to sedentary work, which would have rendered her disabled under the Medical-Vocational Guidelines, Grid Rule 201.12. (Id. at 21).

Social Security Ruling 96-8p explains that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." (S.S.A. July 2, 1996), 1996 WL 374184, at *1. "Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id*. The ALJ is required to address the claimant's exertional and non-exertional capacities. The exertional capacity defines the claimant's remaining abilities "to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling." *Jeske v. Saul*, 955 F.3d 583, 595–96 (7th Cir. 2020). While the Ruling instructs that each function must be considered separately, the Seventh Circuit has recently concluded "that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand" if the reviewing court can determine that the ALJ considered the claimant's ability to perform all seven functions. *Jeske v. Saul*, 955 F.3d at 596 (7th Cir. 2020) (citations omitted). Thus, the question for this Court is "whether the ALJ

applied the right standards and produced a decision supported by substantial

evidence." *Jeske*, 955 F.3d at 596.

The ALJ's RFC found that Lisa could perform "light work as defined in 20

CFR 416.967(b)....." (Dkt. 13-2 at 22). The referenced regulatory definition[4] follows:

> Light work involves lifting no more than 20 pounds at a time with
> frequent lifting or carrying of objects weighing up to 10 pounds. Even
> though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it
> involves sitting most of the time with some pushing and pulling of arm
> or leg controls. To be considered capable of performing a full or wide
> range of light work, you must have the ability to do substantially all of
> these activities.

20 C.F.R. § 416.967(b). The ALJ's analysis, viewed alongside the whole record,

demonstrates that she considered all strength-demand functional limitations in

arriving at her RFC assessment for Lisa. The ALJ detailed Lisa's allegations about

her capacities to sit, stand, and walk. (Dkt. 13-2 at 23, R. 23). The ALJ also

explained, however, how the ALJ concluded that Lisa's specific allegations

concerning her ability to maintain exertional positions were not supported by the

record. (Id. at 24-25, R. 24-25). The ALJ highlighted the objective findings that

would affect Lisa's ability to stand and walk, which were limited to one visit

showing unsteadiness in the context of reported dizziness, and two examinations in

March and April 2017 that showed swelling and limited range of motion in Lisa's

knee after an injury. (Id. at 24, R. 24). The ALJ also explained that Lisa's

---

[4] To the extent that the ALJ referencing the regulatory definition could be considered vague or at least ambiguous as to Lisa's specific exertional capacities, the ALJ was more specific when communicating the hypothetical limitations to the VE that would ultimately comprise Lisa's RFC and support the Step Five determination. (Dkt. 15-2 at 30, R. 722).

complaints of knee and hip pain tapered off around October 2017, and were specifically denied thereafter, which was inconsistent with Lisa's allegations that she needed to alternate positions between sitting, standing, and lying down all day because of pain. (Id. at 25, R. 25). Moreover, the ALJ explained that she only credited impairments related to Lisa's left leg and knee injury by giving Lisa the benefit of the doubt, because there were only limited clinical findings recorded by Dr. Kirkwood and no further, relevant treatment evidence submitted from other providers. (Dkt. 13-2 at 24, R. 24). Furthermore, the ALJ explained that Lisa's ability to manage her pain with only over-the-counter medication was inconsistent with the degree of pain that she alleged affected her ability to maintain positions. (Id.).

The ALJ needed to include limitations based on subjective symptoms only to the extent that she finds them credible. *Simila*, 573 F.3d at 521. Here again, the ALJ's cited reasons of lack of treatment, limited medications, and inconsistent complaints all provided sufficient support under the deferential standard accorded to the ALJ's credibility determination.

Additionally, as discussed previously, to the extent that Lisa relies on her fibromyalgia or lumbago diagnoses or lower back pain to support greater limitations, neither can considered because they were not deemed to be medically determinable impairments. Accordingly, the ALJ did not err by failing to incorporate greater limitations based on Lisa's symptoms that were not attributable to a medically determinable impairment.

Finally, Lisa maintains that the ALJ erred by dismissing her cane usage and failing to include a limitation in the RFC for the use of a cane. The ALJ noted Lisa's testimony that she uses a cane when outside of her home, but also mentioned that no medical provider has prescribed or recommended a cane or other assistive device for Lisa. (Dkt. 13-2 at 24-25, R. 24-25). While Lisa is correct that no prescription is required for cane usage, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), as amended on reh'g in part (May 12, 2010), and that not having a prescription is not probative of the need for a cane in the first place, *Eakin v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) (citing *Terry v. Astrue*, 580 F.3d 471, 477–78 (7th Cir. 2009), the ALJ weighed the evidence and decided against including this limitation in the RFC. The ALJ did not, as Lisa suggests, find that Lisa did not need an assistive device but concluded that the record contained no support for the use of a cane or assistive device. The Court accepts that conclusion.

Accordingly, the ALJ's conclusion regarding Lisa physical impairments and functional limitations is supported by substantial evidence, and the ALJ's decision to limit Lisa to light work stands. Lisa's argument that she is limited to sedentary work and therefore satisfies Grid Rule 201.12 is thus moot.

### ii.   Mental Impairments

Lisa's final argument maintains that the ALJ's RFC does not adequately account for her mental impairments. Specifically, Lisa argues that the RFC does not reflect her moderate limitations in interacting with others, Dr. Maryman's opinion that she needed a low stress environment, or her mild limitations in concentrating,

persisting, or maintaining pace. (Dkt. 19 at 22-27). Additionally, although the VE testified that a hypothetical individual could not be off-task more than 15% of the day or absent more than one day per month, Lisa maintains that the ALJ did not address these points in her decision. (Id. at 24).

During the "paragraph B" criteria analysis at Steps Two and Three, the ALJ found that Lisa had moderate limitations in understanding, remembering, and applying information and interacting with others, and mild limitations in concentrating, persisting, and maintaining pace and adapting or managing oneself. (Dkt. 13-2 at 20-22, R. 20-22).

Finding Lisa's mental impairments to be non-severe based on her level of treatment and reported activities of daily living, the state agency reviewing physicians provided identical narrative assessments of Lisa's mental limitations that "[t]o the extent [her] mental condition permits, the evidence suggests that claimant can understand, remember, and carryout semi-skilled tasks. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. The claimant can attend to task[s] for sufficient periods to complete tasks." (Dkt. 13-2 at 67; 80, R. 67; 80). The state agency consultants found Lisa to be mildly limited in each of the four categories of functioning, but they did not make more detailed assessments concerning specific abilities within the functional area, *i.e.,* responding appropriately to supervisors. (*See* Dkt. 13-2 at 66-67; 79-80, R. 66-67; 79-80). Because the state agency psychological reports were not fully consistent with the record, the ALJ gave these opinions only some weight. (Dkt. 13-2 at 22).

31

During Lisa's psychological consultative examination, Gary Maryman, Psy.D., found Lisa's presentation to be inconsistent with the alleged severity of her symptoms. (Dkt. 13-4 at 217-18, R. 556-57). Dr. Maryman also concluded that a history of alcohol abuse was Lisa's primary issue. (Id.). Dr. Maryman's medical source statement concluded that:

> [Lisa] was believed to be a lady who seems likely to have the intellectual ability for her to understand, retain, and to carry[ ]out . . . simple to somewhat more complicated instruction[s] and task[s]. It was also believed that she would seem to have the ability to carry out a work assignment sufficiently well across a routine work schedule. This lady should be able to interact reasonably well with fellow workers and supervisors and she does not appear necessarily unable to interact and deal with the general public as well. It is also believed that she should be able to adjust and adapt to stressors and pressures of at least a medium to lower stress work environment.

(Id. at 219, R. 558). The ALJ gave "great weight" to Dr. Maryman's opinion. (Dkt. 13-2 at 28, R. 28).

Here, the ALJ found that Lisa had moderate limitations in the broader paragraph B domain of interacting with others. (Dkt. 13-2 at 21, R. 21). For the RFC assessment, the ALJ found that Lisa should be limited to "no public interaction, but occasional interaction with coworkers and supervisors. Relying on Dr. Maryman's consultative opinion, which found that Lisa could interact reasonably well with fellow workers and supervisors, the ALJ found that Lisa was not unable to interact and deal with the general public. (Dkt. 13-2 at 28, R. 28).

Lisa contends that the ALJ's RFC assessment limiting her to occasional interaction with coworkers and supervisors is "woefully insufficient" to address her moderate mental functional limitation in the area of interacting with others. (Dkt.

19 at 24). Instead, Lisa seems to suggest that the ALJ should have limited her to no interaction with supervisors and coworkers to adequately address her limitations.

The ALJ explained that this limitations for interacting with the public was in keeping with the objective findings of Dr. Maryman's assessment and Lisa's cognitive and reasoning abilities. (Dkt. 13-2 at 28, R. 28). Dr. Maryman, for example, described Lisa as fairly polite, with pretty well-developed social skills, and no signs of anxiety. (Dkt 13-4 at 217-18, R. 556-57). Also, when filling out forms for the SSA, the ALJ noted that Lisa did not report any difficulty with authority figures, nor did she display any difficulty getting along with treating providers. (Dkt. 13-2 at 21, R. 21). Lisa reported that her ability to get along with "authority figures," such as bosses, was good. (Dkt. 13-2 at 223, R. 223). The ALJ's discussion of Lisa's ability to interact with others is sufficient and supported by the record, building a logical bridge between the evidence and the conclusion.

Lisa also asserts that the ALJ did not account for her individualized reaction to the demands of work, *i.e.*, stress. (Dkt. 19 at 26-27; *see* SSR 85-15 (S.S.A. 1985), 1985 WL 56857, at *5-6). Lisa further asserts that the ALJ did not provide a logical bridge from the relevant evidence—including Dr. Maryman's assessment that Lisa should be limited to at least a medium to lower stress work environment—to her RFC conclusion. (Dkt. 19 at 27-28).

The Seventh Circuit has explained that when a claimant's limitations are stress-related, the RFC should account for the level of stress that the claimant can handle. *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (citing *Arnold v.*

*Barnhart*, 473 F.3d 816, 820-23 (7th Cir. 2007); *Johansen v. Barnhart*, 314 F.3d 283, 285-89 (7th Cir. 2002)). Here, the ALJ gave great weight to Dr. Maryman's opinion and included every one of his proposed limitations, except for the limitation to a medium to lower stress work environment. The ALJ provided no explanation as to why she did not credit that portion of Dr. Maryman's opinion or include a lower stress requirement in the RFC. This was clear error, and in contradiction of the ALJ's statement that no doctor had suggested any further limitation than those she included in the RFC. *See Spicher v. Berryhill*, 898 F.3d 754, 758 (7th Cir. 2018) (ALJ erred when giving great weight to consultant but not explaining why certain suggested limitations were not adopted for the RFC). If this were the only error in the ALJ's mental RFC, it may well have been harmless.

However, Lisa also makes the argument that even if the ALJ's paragraph B[5] assessment concerning her ability to concentrate, persist, or maintain pace is accepted, the ALJ failed to accommodate those mild limitations in the RFC finding or in the hypotheticals to the VE[6]. (Dkt. 19 at 22-24). The Seventh Circuit has indicated that ALJs are not required to use "magic words" when formulating an RFC, but that RFC must incorporate all of the claimant's limitations in the record, whether from a severe or non-severe impairment. *Lothridge v. Saul*, 984 F.3d 1227,

---

[5] The limitations identified in the "paragraph B" criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process. 20 C.F.R. § 416.920a(d)-(e). However, the RFC assessment used at Steps Four and Five requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorder listings. SSR 96-8p, 1996 WL 374184, at *4.

[6] Plaintiff includes a one sentence argument that the ALJ failed to incorporate all limitations in the hypotheticals presented to the VE. Because this argument is perfunctory and undeveloped, the Court deems it waived. *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (quoting *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016))

1233 (7th Cir. 2021) (citing *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *see also Martin v. Saul*, 950 F.3d 369, 373–74 (7th Cir. 2020) (collecting cases)); *Sandra W. v. Saul*, No. 1:20-cv-00919-JMS-MJD, 2021 WL 1152811, at *4 (S.D. Ind. Mar. 26, 2021).

In this case, the ALJ concluded that Lisa could perform simple, routine, and repetitive tasks; understand, remember, and carry out simple instruction; make decision on simple matters; have no public interaction; and have occasional interaction with coworkers and supervisors. (Dkt. 13-2 at 22, R. 22). The ALJ also makes an effort to delineate which of the RFC limitations is designed to address each of the "paragraph B" criteria. Specifically, the ALJ states that Lisa's moderate limitation in understanding, remembering, or applying information is accounted for by limiting her to simple, routine, and repetitive tasks, simple instructions, and simple decision-making, and her moderate limitation in interacting with others is accounted for by limiting her to no public interaction and only occasional interaction with coworkers and supervisors. (Id. at 21, R. 21). Where the ALJ errs, though, is when she fails to include any RFC limitations that would address Lisa's mild limitations with concentrating, persisting, or maintaining pace or, in the alternative, expressly state that no additional limitations were warranted. Instead, after the Step Three analysis where she considered the "paragraph B" criteria, the ALJ never mentions anything resembling concentration, persistence, or pace again.

The Commissioner attempts to argue that the ALJ adequately captured Lisa's mild limitations with concentration, persistence, and pace by including the

various non-exertional limitations in the RFC (Dkt. 20 at 16); that argument, however, is explicitly contradicted by the ALJ's own statements that the RFC limitations are only designed to accommodate Lisa's difficulties with interacting with others and understanding, remembering, and carrying out instructions. (Dkt. 13-2 at 20-22, R. 20-22).

In regard to the claimant's mild limitation with concentration, persistence and pace, a brief review of the record shows consistent complaints of pain, fatigue, headaches, depression, anxiety, racing thoughts, and a documented inability for Lisa to keep up with housework, bills, and personal hygiene, all of which could support limitations for concentration, persistence, and pace. The ALJ, however, may well have decided after reviewing this same evidence that no further limitations were warranted based on the record, but she was required to say so. *Passig v. Colvin*, 224 F. Supp. 3d 672, 682 (S.D. Ill. 2016); *Keith R. v. Saul*, No. 19 C 868, 2021 WL 308885, at *4 (N.D. Ill. Jan. 29, 2021) (citing *Lothridge*, 984 F.3d at 1233). Therefore, the ALJ did not provide a logical bridge from the evidence to her conclusion.

Finally, Lisa asserts that the ALJ's decision should be remanded for failure to address the VE's testimony at the hearing. Specifically, the VE testified that a hypothetical individual who was off-task 15% of the day would not be eligible for any employment, and also that a hypothetical employee who missed three days or more in an average month would not be eligible for any employment. (Dkt. 15-2 at 32, R. 724). Nowhere in the ALJ's opinion does she address either of these potential

functional limitations, either one of which would be case dispositive and result in a finding that Lisa was disabled. As noted previously, the ALJ may have decided that neither limitation was warranted based on the record at hand, but this Court is unable to ascertain whether the ALJ adequately considered these two potential RFC limitations. *Lothridge*, 984 F.3d at 1234 (citing *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019). On this issue as well, the ALJ failed to provide a logical bridge from the evidence to her conclusion.

Accordingly, the Court finds the ALJ's mental RFC analysis lacking, and remand is required to further address these issues.

## V.   CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). Final judgment will issue accordingly.

So ORDERED.


Date: 8/18/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana




Distribution:
All ECF-registered counsel of record via email.

37